UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KAREN D. DAVIS,

                          Plaintiff,

                          <u>DECISION AND ORDER</u>

                          02-CV-6628L

        v.

VERIZON WIRELESS,

                          Defendant.
_____

KARIN M. SAMS,

                          Plaintiff,

        v.                  02-CV-6635L

VERIZON WIRELESS,

                          Defendant.

_____

LA TANYA A. MC DONALD,

                          Plaintiff,

        v.                  02-CV-6637L

VERIZON WIRELESS,
ADECCO,

                          Defendants.
_____

## INTRODUCTION

These discrimination actions were brought by three former Verizon Wireless employees alleging claims of sexual harassment, gender and/or race discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the New York Human Rights Law, N.Y. Exec. L. § 296 *et seq*. Plaintiffs all worked in Verizon's Financial Services Department sometime between the fall of 2001 and early spring of 2003. Their discrimination claims primarily concern the actions of two Verizon supervisors, Greg Callaghan ("Callaghan") and Jeremy Schaut ("Schaut"). Plaintiffs allege that they were subjected to a hostile work environment based on race or gender. They also claim that Verizon's management did not meaningfully investigate or take remedial measures once they complained of discrimination, and that they were retaliated against for doing so.[1]

Before the Court are defendant Verizon's motions for summary judgment. Also before the Court is defendant Adecco's motion for summary judgment in the *McDonald* case.[2] At a motion hearing held on August 30, 2005, the Court granted certain portions of defendants' motions and dismissed a number of plaintiffs' claims.[3] This Decision and Order addresses the remaining portions of defendants' motions upon which the Court reserved decision.

---

[1] I consolidate these actions for purposes of this decision. FED. R. CIV. P. 42(a). Whether these cases should be consolidated for trial is a decision best left for another day.

[2] Adecco is a temporary agency that staffed certain employees at Verizon, including plaintiff McDonald. Adecco is a party only in the *McDonald* case.

[3] In *Davis*, the Court dismissed those aspects of plaintiff's first and second claims that alleged disparate treatment based on race and dismissed in their entirety plaintiff's third and fourth claims based on gender discrimination. In *Sams*, the Court dismissed those aspects of plaintiff's first and second claims that alleged disparate treatment based on gender and dismissed those aspects of plaintiff's third and fourth claims that alleged retaliatory discharge. In *McDonald*, the Court dismissed those aspects of plaintiff's first and second claims against Verizon and Adecco that alleged disparate treatment based on race and dismissed plaintiff's third and fourth claims against Adecco.

For the reasons articulated below, the remainder of defendants' motions are granted in part and denied in part.  I find that issues of fact exist regarding Davis's and McDonald's race-based, hostile-work-environment claims that require resolution by a jury.  Sams's gender-based, hostile-work-environment claims, however, are dismissed with prejudice.  As for plaintiffs' retaliation claims, only McDonald has raised an issue of fact regarding that claim to survive summary judgment.  Davis's and Sams's retaliation claims, therefore, are also dismissed with prejudice.

## FACTUAL BACKGROUND

### *Karen Davis*

Plaintiff Karen Davis, an African-American, was hired in November 2001 as a Credit Order and Operations Supervisor ("COOS") in the Financial Services Department of Verizon's Call Center.  Like the other COOSs, she supervised approximately 10-15 customer service representatives (referred to by the parties as "reps") at any given time.  Plaintiff claims that Verizon told her that she was hired as a COOS because of the number of African-American reps that worked at the Call Center.  According to Davis, Verizon hoped that the African-American employees would "relate" to her better.

Davis claims that during her tenure, approximately 70% of the Call Center employees were African-American.[4]  Most African-American employees, she asserts, held entry level positions as

---

[4]  The only evidence in the record to support the 70% statistic is Davis's deposition testimony.  Verizon does not really dispute this figure, though, and it did not submit any evidence setting forth the precise racial composition of the Call Center during the relevant time period.  At the motion hearing, Verizon would not commit to even a statistical range of the number of employees who were African-American, arguing instead that the percentage was fluid during the relevant period.  Drawing all reasonable factual inferences in favor of the non-moving party, as I

(continued...)

reps or worked as temporary contract employees through Adecco.  In comparison, out of eight

COOSs, she and Sheela Eason were the only two African-Americans.  The COOSs reported to the

Associate Director of Customer Financial Services, a position that was occupied at all relevant times

by a Caucasian – first Callaghan, and then his replacement, Elizabeth Flint.

Davis alleges that she was subjected to a race-based hostile work environment at Verizon and

then retaliated against after complaining about that environment.  She claims that Callaghan held a

racial animus toward African-Americans and that this animus manifested itself in numerous ways

that affected her employment.  Davis alleges that Callaghan excluded her from meetings, denied her

supervisory direction, and undermined her ability to do her job by firing African-American reps that

reported to her without first consulting her or utilizing a progressive disciplinary process.  He also

made condescending remarks to her, once accusing her and two other female employees who had

raised workplace issues with him as acting "like 16 year-old girls."  She also claims that Callaghan

treated Caucasian employees more favorably and gave them more responsibility.  This was

particularly true for Schaut, a Caucasian COOS.  According to Davis, Callaghan treated Schaut as

a "super-COOS" and directed him to supervise her and the other COOSs, as well as their reps,

despite the fact that Schaut had no authority from Verizon to do so.

Davis also alleges that under Callaghan's supervision, African-American employees received

less favorable treatment in certain terms and conditions of employment.  She claims that there were

disparate hiring standards for African-Americans, that they were disciplined more harshly than their

---

[4](...continued)
must on a motion for summary judgment, I will assume that plaintiff's evidence regarding the
racial composition of the Call Center is accurate.

Caucasian counterparts, that they were not promoted as frequently as Caucasians, and that they received less favorable work schedules.

Davis claims that Schaut was racist and the other principal architect of the hostile work environment. Schaut allegedly used rude or derogatory language when speaking to or referring to a group largely comprised of African-American reps, including phrases such as "those people" and "you people." In addition, at times, he referred to himself as a "slave driver" or "slave master." Plaintiff McDonald reported to Davis (in her capacity as a supervisor) that on one occasion, Schaut murmured "uh, these niggers" in response to a question McDonald asked him. COOS Gina Mazza also reported to Davis that she heard Schaut use the racial epithet "nigger" while making a joke sometime in 2002. Another rep, Tonie Porter, reportedly heard Schaut use the epithet "nigger" on "a number of occasions" in 2000 and 2001 (*see* Porter Aff., ¶7), and she complained about this to Davis. Schaut also made statements to the effect that he "could just slap the reps," and that other reps were "stupid." Further, it is alleged that he told two other COOSs that Davis was "useless and good for nothing." He also told plaintiff McDonald on more than one occasion to "shut up and sit down."

Davis claims that another Caucasian COOS, Misty Schutt, who allegedly worked closely with Schaut and was one of Callaghan's favorites, contributed to the hostile work environment by treating African-American reps more harshly and talking to them like they were "less than human."

Davis maintains that Verizon exacerbated the hostile work environment by failing to conduct a meaningful investigation concerning her numerous and repeated complaints or take any remedial action. She alleges that those who investigated her allegations were all Caucasian. She claims that she met with Callaghan several times in November and December 2001 to complain about Schaut's

discriminatory behavior but that Callaghan did not address the problem. Davis then took her discrimination complaints about Callaghan and Schaut to Verizon's Human Resources department. However, the Human Resources department, specifically Deanna Kempinski and Nancy Percent, failed to take any remedial action or properly investigate her discrimination complaints. Davis claims that it was not until she (together with several other employees, including plaintiffs Sams and McDonald) filed an EEOC charge that Verizon took any steps to meaningfully investigate the complaints of discrimination.[5]

Ultimately, Callaghan was terminated from Verizon in April of 2002 after receiving a "vote of no confidence" from his supervisors allegedly due to his abrasive management style. Callaghan's replacement, Elizabeth Flint, held "skip-level" meetings[6] with the reps to listen to their workplace complaints. According to notes taken at these meetings, reps complained about numerous workplace-related issues, including rude behavior, breaches of confidentiality, training issues, but they also complimented certain supervisors, including Davis. The notes also indicate that reps complained of Schaut's behavior and remarks, including his utterance of the word "nigger" in McDonald's presence and that he once said to a rep "look at me, like a slave driver."

It is undisputed, though, that Flint took no steps to investigate the allegations of discrimination or the racist remarks because the incidents occurred when Callaghan was the

---

[5] Verizon acknowledges that it received complaints regarding Callaghan's management style, favoritism, and rude behavior, but maintains that the allegations were not framed as racial or gender discrimination. Questions of fact exist regarding the exact nature of the complaints. Davis alleges that she complained no less than 20 times regarding Callaghan and Schaut's discriminatory behavior. For purposes of this motion, the Court will assume that the complaints were framed as complaints of discriminatory conduct.

[6] The meetings were called "skip-level" because they were conducted outside the presence of the intermediate level manager COOSs.

supervisor.  It is also undisputed that when upper-level management became aware of allegations that Schaut used racial epithets, or terms like "slave master" or "slave driver," Verizon did not take any remedial measures, such as instituting diversity training in the department, although Human Resources personnel admit that was an available option.

At some point, Schaut was issued a "final written warning" about his management style, but the warning was based on his rude behavior, not because he allegedly engaged in racial discrimination.  In June 2002, as part of a consolidation of the Financial Services Department, Schaut and three other COOS were demoted to reps. Schaut thereafter took a lateral, non-supervisory position in a different department at Verizon, where he remains employed today.

In March 2003, Verizon underwent a reduction-in-force. Verizon consolidated the entire Financial Services Department. The work was absorbed by other departments and plaintiff Davis and approximately 120 other employees were laid off.

*LaTayna McDonald*

At all relevant times, plaintiff LaTayna McDonald, an African-American, was an employee of defendant Adecco, a temporary agency that provided numerous employees for Verizon.  During her tenure as an Adecco employee from July 2001 through August 5, 2002, McDonald was assigned to work at Verizon as a rep.  While at Verizon, she claims that she was subjected to a race-based hostile work environment and retaliated against after she complained about discrimination and filed a charge with the EEOC.  To support her claims, McDonald relies on the same evidence as plaintiff Davis regarding the racial composition of  employees at the Call Center.

When she was first placed at Verizon, McDonald reported to Schaut. Sometime near the holiday season in 2001, McDonald alleges that she asked Schaut a question about an assignment. She claims that Schaut, who often appeared to be annoyed by reps' questions, responded to her and, as he was walking away, said "uh, these niggers." Verizon supervisors claim that during their investigation, Schaut flatly denied that he ever used this racial epithet.[7]

McDonald also claims that, in the Summer of 2001 she heard Schaut yell at a group of African-American reps, "you people, shut up." On another occasion in the Spring of 2002, he said to a group of about 40 reps, almost all of whom were African-American, "you people need to get back on the phones." She claims on another occasion Schaut blatantly ignored her request for help with a particular call, acting as if she was not in the room. One other time, Schaut also told her "shut up and sit down." She also alleges that in the Winter of 2001, she approached Schaut's office and overheard him telling Natalie Horn, another COOS, that McDonald had a voice like a 1-900 phone sex operator.

McDonald complained to two COOS, plaintiffs Davis and Sams, about Schaut's behavior. She did not complain to the Human Resources department. McDonald also claims that she complained to Adecco on two or three occasions by telephone, but admits that she never reported to Adecco that Schaut had used the racial epithet "nigger." During one such conversation, Adecco told her that if she was unhappy, it would find her another assignment. McDonald declined to be placed with a different employer, though, because the Verizon facility was convenient to her home. Nevertheless, she claims that Adecco personnel "brushed off" her complaints.

---

[7] Absent from Verizon's motion for summary judgment, however, is a sworn statement from Schaut to that effect.

McDonald further claims that after she filed her EEOC charge in May 2002, she was subjected to retaliation at the workplace. She claims she was excluded from group meetings, and that she was monitored more closely by supervisors. In August 2002, McDonald applied for but was denied a permanent position at Verizon. Her assignment at Verizon ended, and she opted not to seek other employment through Adecco.

*Karin Sams*

Plaintiff Karin Sams is a Caucasian female who began working at Verizon on November 6, 2001 as a COOS. She was one of eight COOS, six of whom were female. Sams's discrimination claims are different than those alleged by Davis and McDonald. Sams alleges *quid pro quo* sexual harassment, a *gender*-based hostile work environment, and retaliation for complaining about discrimination.

Sams alleges that trouble began almost immediately when she started working at Verizon in early November 2001. Within one week, Sams alleges that she met with Callaghan, her immediate supervisor. He allegedly told her that there was an opening for a managerial position between Associate Director (his position) and COOS (her position). He told her that if she "played [her] cards right," he would sign off on the paperwork so that she could post for the position, despite the fact that Verizon's policy required that an employee hold a position for at least six months before being eligible for a promotion. Sams claims that this discussion made her uncomfortable.

One week later, prior to a November 15th meeting at the Four Points Sheraton Hotel, Callaghan allegedly told the Sams that he had a room at the hotel and asked her if she would like to stay there with him and "have some fun." Sams told Callaghan that she was happily married and that

his sexual advances were unwelcome. Callaghan denied every propositioning Sams.  Callaghan then allegedly brought up the promotion again, and remarked that Sams could probably really use the new position and pay.  It is undisputed that there was no such intermediate managerial position that was available to Sams or anyone else.

Sams does not claim that Callaghan touched her inappropriately, nor does she claim that he said anything else of a sexual nature after these two incidents.  Sams does allege, however, that she was exposed to adverse treatment following her rejection of Callaghan's advances.  She claims that her opportunity for promotion was taken away due to her refusal to comply with Callaghan's propositions, that her job responsibilities were decreased, that she was excluded from project assignments and meetings, and that she was subjected to mistreatment and harassment from co-workers.

Sams further alleges that she was mistreated by Schaut, as well as senior customer service representative Jackie Kyle (who held a position below a COOS), who allegedly shoved Sams on one occasion and repeatedly made disparaging remarks about her to other coworkers. She alleges this was done with the consent of Callaghan. Additionally, Schaut acted as if he was Sams's superior, even though they were both COOSs, and spoke rudely, if at all, to Sams and other female COOS. Sams contends that Schaut (and Callaghan) sent her hostile, sarcastic e-mails, although none are contained in the record.

Sams also claims that her hostile work environment was exacerbated by Schaut's use of racially disparaging remarks, including use of the word "nigger" and phrases such as "you people" and "slave driver" when referencing his relationship to African-American employees within the Call Center.

- 10 -

Sams contends that she met with the Human Resources department throughout the course of her employment to complain about Callaghan's propositions and her subsequent mistreatment, but no action was taken. Sams also alleges that she and others met with Regional Director, Chris Allen, in January 2002 to express their concerns about the workplace.  When Sams asked to be removed from Callaghan's supervision, Allen denied the request due to a purported "hiring freeze."

In April 2002, plaintiff filed an EEOC charge against Verizon asserting gender discrimination, sexual harassment, and retaliation in violation of Title VII.  The EEOC issued a determination in September 2002 that its investigation did not substantiate the charges.  Sams alleges that the harassment and mistreatment continued, and media coverage surrounding EEOC charges by eight other employees only exacerbated the hostility.  Shortly after she filed the charge with the EEOC, Callaghan was terminated.

In July 2002, on the advice of her doctor, plaintiff took disability leave due to depression caused by the hostile work environment. Thereafter, on July 8, 2002, as part of departmental downsizing, plaintiff was demoted from COOS to rep, along with Schaut, Michael Chasey, and Gina Mazza,.  Schaut and Chasey, the two males, obtained other positions with Verizon, but Sams and Mazza, who were unaware that such positions were available, were not hired.

Sams's disability benefits were eventually discontinued because she allegedly provided false information on her disability application. Verizon discovered that Sams was working in a restaurant as a waitress while on disability leave, despite claiming on her application that she had not been working for months.  Plaintiff was terminated on October 3, 2002.

**DISCUSSION**

**I.  Summary Judgment in Discrimination Cases**

When deciding a motion for summary judgment brought pursuant to FED. R. CIV. P. 56, a

court's responsibility is to determine whether there are issues to be tried.  *Duse v. Int'l Bus. Machs.*

*Corp.*, 252 F.3d 151, 158 (2d Cir.2001). Summary judgment will be granted if the record

demonstrates that "there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247 (1986). "A fact is 'material' for these purposes if it 'might affect the outcome

of the suit under the governing law.' . . . An issue of fact is 'genuine' if 'the evidence is such that

a reasonable jury could return a verdict for the nonmoving party.'" *Lovejoy-Wilson v. NOCO Motor*

*Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir.2001)(quoting *Anderson*, 477 U.S. at 248); *see also Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The general principles regarding summary judgment apply equally to discrimination actions.

*See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (quoting *St. Mary's Honor*

*Ctr. v. Hicks*, 509 U.S. 502, 524 (1993))(reiterating "that trial courts should not 'treat discrimination

differently from other ultimate questions of fact.'"). Although courts should be cautious about

granting summary judgment in cases where motive, intent or state of mind are at issue, *see Dister*

*v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988); *Montana v. First Fed. Sav. and Loan*

*Ass'n of Rochester*, 869 F.2d 100, 103 (2d Cir.1989), "the salutary purposes of summary judgment

– avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to

... other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985)(summary judgment

rule would be rendered sterile if mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion).

## II.   *Quid Pro Quo* **Sexual Harassment**

Turning first to plaintiff Sams's claim of *quid pro quo* sexual harassment, I find that Verizon is entitled to summary judgment.  "In order to state a [sexual] harassment claim under a *quid pro quo* theory, a plaintiff must allege that (1) she was subject to unwelcome sexual conduct or an unwelcome sexual advance, and (2) her reaction to that conduct was used as the basis for an adverse employment action." *Hill v. Children's Vill.*, 196 F.Supp.2d 389, 396 (S.D.N.Y.2002) (citing *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir.1994)).

Verizon concedes here that an issue of material fact exists regarding the unwelcome sexual advances of its manager, Callaghan.  Verizon claims, however, that summary judgment is nevertheless warranted because there was no adverse employment action taken as a result of Sams's refusal to accept Callaghan's advances.  Sams challenges this assertion suggesting several adverse consequences.  These alleged adverse employment actions include the failure to promote her to an intermediate management position, as well Callaghan's ignoring her, stripping her of responsibilities, and excluding her from projects, work assignment and intra-office communications.  I find, however, that none of these actions can support a *quid pro quo* claim.

### A.   **Failure to Promote**

Sams contends that Callaghan's alleged propositions included enticements of a promotion to an intermediate managerial position.  It is undisputed, however, that no such position ever existed.

- 13 -

Even if Sams had reason to believe from Callaghan's words that such a position was somehow attainable, that belief is insufficient evidence that any adverse employment action was taken. Rather, claims involving an unfulfilled threat of adverse employment action should be analyzed, not as *quid pro quo* claims, but as hostile work environment claims. *See Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) ("Because [plaintiff's] claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct", and not a *quid pro quo* claim.).

Plaintiff's *quid pro quo* claim concerning the failure to promote, therefore, cannot withstand summary judgment. *See George v. Liverpool Cent. Sch. Dist.*, No. 97-CV-1232, 2000 WL 1499342, *10-11 (N.D.N.Y. Sept. 29, 2000) (finding that plaintiff schoolteacher's *quid pro quo* sexual harassment claim could not survive summary judgment where she failed to experience any adverse employment action after rejecting her supervisor's overtures and failed to receive a permanent position that the supervisor had "held out" as a "carrot" to entice her to submit to his advances despite lacking the requisite authority to effectuate such a promotion); *see also King v. Friend of a Farmer Corp.*, No. 97 CV 9264, 2001 WL 849460, *3 (S.D.N.Y. Jul. 26, 2001) ("since [plaintiff's] employment status was never actually affected by her supervisor's threats, she may not claim *quid pro quo* harassment"); *Burlington Indus.,* 524 U.S. at 770 n.3 (Thomas, J., dissenting) ("a supervisor's threat to take adverse action against an employee who refuses his sexual demands, if never carried out, may create a hostile work environment, but that is all. Cases involving such threats, without more, should therefore be analyzed as hostile work environment cases only," and not as *quid pro quo* claims).

B.      Other Alleged Acts of Adverse Employment Action

Sams's other allegations of adverse action by Callaghan or others are insufficient to establish

a *quid pro quo* claim.  Sams alleges that Callaghan undertook a campaign to undermine her ability

to effectively perform her duties as COOS following her rejection of Callaghan's overtures.  Sams

asserts that she was "ignored by Callaghan, stripped of many of her responsibilities, and excluded

from projects, work assignments and valuable intra-office communications." Verizon argues, and

I agree, that such "acts" do not constitute the type of adverse employment action required under the

second prong of the test for *quid pro quo* sexual harassment.

First of all, it is important to note that Sams failed to provide sufficient evidence that she was

in fact ignored, stripped of her responsibilities, and excluded from projects.  In her deposition

testimony, she referenced e-mails that she claimed would specify her allegations of adverse treatment

following her rejection of Callaghan's overtures.  Sams, however, failed to produce any e-mails, nor

did she articulate with any more specificity what conduct she alleges Callaghan or others at Verizon

took against her.

It is well-settled that "[f]or a plaintiff in a discrimination case to survive a motion for

summary judgment, he or she must do more than present conclusory allegations of discrimination

. . . he or she must offer concrete particulars to substantiate the claim." *Alfieri v. Sysco Food Servs.*,

192 F.Supp.2d 14, 20 (W.D.N.Y.2001) (internal citations and punctuation omitted). Here, Sams has

failed to adduce concrete particulars about the events that she claims occurred actually took place.

Moreover, even if Sams had come forward with sufficient evidence, the "acts" about which

she complains do not constitute adverse employment action within the meaning of Title VII.  The

Supreme Court has stated that an adverse employment action "constitutes a significant change in

- 15 -

employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus.*, 524 U.S. at 761. Within the context of this case, merely ignoring an employee or depriving her of being present at certain meetings or having certain responsibilities does not rise to the level of an adverse employment action. These purported incidents are not indicative of a significant change in employment status. Summary judgment, therefore, is warranted as to Sams's *quid pro quo* claim.

### III.  Hostile Work Environment

In order to prevail on a claim that sexual harassment or racial hostility caused a hostile work environment in violation of Title VII or the NYHRL, a plaintiff must establish two elements. First, plaintiff must show that her workplace was permeated with "discriminatory intimidation, ridicule, and insult ... that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)(internal citations and punctuation omitted). Second, plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir.2003); *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir.2002); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997).

To meet the first requirement, plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000)(internal punctuation omitted). Plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive,

and one that the victim did in fact perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

In *Harris*, the Supreme Court set forth a non-exhaustive list of factors relevant to determining whether a given workplace is permeated with discrimination so "severe or pervasive" as to support a Title VII claim. These include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a "mere offensive utterance"; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted to the plaintiff. *Harris*, 510 U.S. at 23. Importantly, "[i]n order to meet [her] burden, the plaintiff must show more than a few isolated incidents of racial enmity." *Williams v. Westchester*, 171 F.3d 98, 100 (2d Cir.1999).

The Second Circuit has instructed that the Court should consider the totality of the circumstances in determining whether plaintiff has submitted evidence sufficient to support a finding that a hostile work environment relating to discrimination existed. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir.1997) (citing *Harris*, 510 U.S. at 23). Thus, the factors outlined above must be considered "cumulatively," so that the Court can "obtain a realistic view of the work environment." *Id.* (quoting *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 (7th Cir.1994)). This includes evaluating the "quantity, frequency, and severity" of the incidents. *Id.* (citing *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir.1994)).

A.     **Race-based Hostile Work Environment**

I find that questions of fact exist regarding whether either Davis or McDonald can establish an "objectively" hostile work environment based on race under the standards enunciated above. Whether these claims should survive summary judgment admittedly is a close call based on the

record before the Court.  I find, however, that there are credibility and factual issues that need to be resolved by a jury at a trial, and not by the Court on summary judgment.

I find that a reasonable jury could conclude that Davis and McDonald were subjected to a race-based hostile work environment in the Financial Services Department.  This environment was created when Schaut used the racial epithet "nigger" in the workplace, referred to himself as a "slave-driver" or "slave-master," used of the phrases "you people," "those people," "they," or "them" when addressing a predominantly African-American workforce, and directed his abusive management style (which included  statements like "shut up and sit down," "useless and good for nothing," and threats that he could just "slap the reps") toward that same predominantly African-American workforce.

I agree with plaintiffs that the racial composition of the Financial Services Department should be considered by the Court (and the jury) in evaluating whether an objectively hostile work environment existed. This is particularly true when evaluating certain statements allegedly made by Schaut. Statements like "you people" or "they" and "them," when considered out of context, do appear to be race-neutral. However, if Schaut was addressing a group of reps who were predominantly African-American, those phrases could be construed by the trier of fact as racially offensive, particularly in light of the fact that Schaut allegedly used the racial epithet "nigger" in the workplace on other occasions.  I also believe, though, that a reasonable jury could conclude otherwise, and find that Schaut was simply admonishing a group of employees  who were not at their work stations by addressing them collectively as "you people," and that there was no discriminatory intent involved.  That, however, is a determination that properly is for the jury to make at trial.

- 18 -

I also find that a reasonable jury could conclude that the racial hostility was perpetuated by Callaghan, who not only failed to remedy racist behavior by Schaut, but actually treated Schaut as a "super-COOS" by directing that he oversee the work of certain other COOSs, including Davis, an African-American. Davis and McDonald could have felt that Callaghan's favorable treatment of Schaut (and three other Caucasian COOSs) demonstrated his own racial bias, especially when considered in light of the allegations that Callaghan himself had an abusive management style when interacting with the same predominantly African-American workforce, as compared to the way he managed Caucasian employees.

I also find that a jury could reasonably conclude that Verizon's response to the complaints of discrimination did nothing to remedy the environment, and that this too exacerbated the racially hostile workplace. The record could support the view that Verizon's management (all of whom were Caucasian) never canvassed African-American employees about the alleged discrimination in the workforce by Callaghan, Shaut, and at times, Misty Shutt.  Callaghan's replacement, Elizabeth Flint, admitted in her deposition that she never took any steps to investigate the claims of racial hostility or racist comments because those actions did not occur "on her watch."  I also find that a jury could credit plaintiffs' allegations that Verizon's Human Resources department did not properly investigate claims of discrimination in the workforce nor took any corrective measures to alleviate the racially-hostile environment until plaintiffs filed charges with the EEOC.

Verizon's contention that summary judgment is warranted on plaintiff Davis's hostile work environment claim because she had only second-hand knowledge of and exposure to the word "nigger" during this time, although of concern, is not dispositive. The record shows that Davis herself only experienced behavior by Schaut and Callaghan that was race-neutral on its face.

Nevertheless, Davis directly experienced certain behavior by Schaut and Callaghan that a jury could conclude was not race-neutral, and was the product of their racial-bias. When considered in light of the evidence that more than one person reported to Davis that Schaut used the term "nigger," that Davis witnessed Schaut and Callaghan treat certain African-American employees differently, and that Davis's repeated complaints to management about discrimination were ignored, a reasonable jury could conclude that Davis was subjected to an objectively hostile work environment. *See Schwapp*, 118 F.3d at 112 ("whether [plaintiff] was aware of [other incidents directed towards other employees] during his employment, and more significantly, whether in light of these incidents, the incidents [plaintiff] experienced more directly would reasonably be perceived, and [were] perceived, as hostile or abusive . . . are factual issues that should be resolved by a trier of fact.") (internal quotations and citations omitted).  I agree with Verizon that the probative value of incidents that did not occur in Davis's presence may be of modest weight.  Nevertheless, that is an issue for the jury to decide.

I agree with Verizon that this case does not fall into those clear cases in which there is a severe, steady barrage of opprobrious racial comments in the work place. Verizon relies on *Schwapp*, 118 F.3d at 110-11, for the proposition that:

> The mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated instances of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment.

Verizon relies on authority that even repeated use of the word "nigger" does not require denial of summary judgment on a hostile work environment claim. *See Hannon v. Wilson Greatbatch, Ltd.*, No. 00-CV-0203, 2002 WL 1012971, at *3-*4 (W.D.N.Y. Apr. 24, 2002) (multiple uses of the word "nigger" were not sufficiently severe and pervasive to alter the conditions of plaintiff's work environment); *Turner v. Nat'l R.R. Passenger Corp.*, 181 F.Supp.2d 122, 132 (N.D.N.Y. 2002) (repeated use of "nigger" by employees in connection with O.J. Simpson trial did not create hostile work environment); *Brown v. Middaugh*, 41 F.Supp.2d 172, 187-88 (N.D.N.Y. 1999) (history of references to plaintiff as a "nigger," "lazy nigger," "piece of shit nigger," and "good for nothing nigger," while "despicable, odious and offensive" were not "sufficiently severe or pervasive such that plaintiff's hostile work environment claim can survive summary judgment").

However, the record here is not clear and issues of fact exist regarding the frequency that Schaut used the racial epithet "nigger."  Verizon acknowledges in its papers the severity of this particular epithet.  *See White v. BFI Wast Servs.*, 375 F.3d 288 (4th Cir.2004) ("Far more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African-Americans. 'Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.'") (quoting *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir.1993)). It is up to a jury to determine whether, how often, and under what circumstances Schaut allegedly used this language.

In addition, in the cases relied on by Verizon, summary judgment was warranted because either plaintiffs never complained to management and had no basis to impute the use of that word by a co-worker to the employer, *see Hannon*, 2002 WL 1012971, at *8, or, after complaining to

- 21 -

management, the offensive conduct ceased immediately, *see Brown*, 41 F.Supp.2d at 187, or plaintiffs failed to allege that the remarks unreasonably interfered with job performance or that they felt threatened or humiliated, *see Brown*, 41 F.Supp.2d at 188; *Turner*, 181 F.Supp.2d at 133.

Davis and McDonald, however, both reported the conduct to management and the record does not show with any level of certainty that Verizon acted promptly after plaintiffs' complaints or that the racially-offensive behavior stopped immediately. In addition, both Davis and McDonald testified as to how they were adversely affected by this conduct.

When the Court considers the totality of circumstances alleged and views the evidence in a light most favorable to plaintiffs, there is sufficient evidence upon which a jury could find a race-based hostile work environment. These circumstances include the following:

- Schaut referred to McDonald as a "nigger"

- Schaut used the epithet "nigger" on numerous occasions in 2000 and 2001

- Gina Mazza heard Schaut use the term "nigger" when making a joke in 2002

- Schaut referred to himself as a "slave master" and "slave driver"

- Schaut referred to groups of mostly African-American reps as "those people" and "you people" and "they" and "them"

- Schaut told McDonald, an African-American, more than once to "shut up and sit down"

- Schaut announced that, because of his favorable treatment by management, he could even "slap the reps" and get away with it

- Schaut would monitor the calls of African-American reps that did not report to him

- Shaut would not speak to, train or acknowledge African-American reps, including those that worked directly for him

- Schaut call monitored McDonald and then made fun of her, stating that she had a voice like a phone sex operator

- African-American reps were disciplined more harshly or terminated more frequently

- African-American reps were not promoted as frequently

- COOS Misty Schutt, a Caucasian, also discriminated against African-American reps, talking to them like they were "less than human"

- Callaghan failed to address Schaut's discriminatory treatment of African-American reps and other COOS

- Callaghan denied Davis, one of only two African-American COOS, any "real responsibility as a supervisor" and excluding her from the decision-making process

- Callaghan fired many African-American reps who reported to Davis without first notifying her and without prior disciplinary notice or action

- Callaghan excluded Davis from departmental meetings, denied her supervisory direction, and undermined her ability to do her job

- Callaghan generally treated African-American employees (or those Caucasian employees who associated with African-American employees) less favorably, less friendly, and was not responsive to their requests or gave them less significant or less desirable work assignments

- Callaghan's favorite employees were four Caucasian employees, including Schaut and Misty Shutt, two COOS who allegedly held racial animus against African-Americans

- Callaghan treated Schaut as a sort of "super-COOS" and condoned Schaut supervising other COOSs and their reps, despite the fact that Schaut had no real authority to do so

- Verizon failed to properly investigate numerous complaints made by both African-American and Caucasian COOS and reps, that Callaghan and Schaut were engaging in discrimination Assuming a jury credits this evidence, it would be sufficient to establish an objectively

hostile work environment based on race. Put another way, I cannot say as a matter of law that this

evidence, if believed by a jury, could never establish a hostile work environment claim.  Therefore,

Verizon's motion for summary judgment in the Davis and McDonald cases is denied  *See Schwapp*,

118 F.2d at 111-12; *McKay v. Principi*, No. 03-CV-1605, 2004 WL 2480455 (S.D.N.Y. Nov. 4, 2004); *Hill v. Taconic Developmental Disabilities Office*, 283 F.Supp.2d 955, 960 (S.D.N.Y.2003).[8]

**B.    Adecco**

I find that Adecco is entitled to summary judgment in the *McDonald* case.  McDonald has failed to show that any hostile work environment at Verizon should be imputed to Adecco.  *See Mack*, 326 F.3d at 122 (plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer).

When hired by Adecco, McDonald received an employee handbook that contained "A Prohibition of Discrimination and Harassment Policy" informing employees to contact their Adecco supervisor if they believed that they were the victims of discrimination or harassment.  McDonald

---

[8] That being said, plaintiffs' claims suffer from certain evidentiary weaknesses.  For instance, McDonald testified that Schaut was rude to both Caucasian and African-Americans employees alike, thereby demonstrating that his alleged "hostile" behavior may not have been racially motivated. *Cf. Brown v. Henderson*, 257 F.3d 246, 254, (2d Cir.2001)("[I]n the absence of evidence suggesting that a plaintiff's sex was relevant, the fact that both male and female employees are treated similarly, if badly, does give rise to the inference that their mistreatment shared a common cause that was unrelated to their sex.").  Plaintiffs will have to convince a jury that the "hostile" work environment was based on their race.  Conduct is deemed "hostile" if it relates to discriminatory conduct, *i.e.* involves treating a particular employee or class of employees different than others.  A "hostile" work environment is not synonymous with an unpleasant, harsh, combative or difficult work environment.  The nation's workplace is most likely populated with abusive and banal supervisors.  No doubt they use insensitive, profane and sometimes vulgar language toward employees.  Such evidence, though, is insufficient to make out a claim for discrimination.  It is well-settled that "Title VII is not a 'general civility code.'" *Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir.1999) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Although Title VII "protects employees from improper discriminatory intimidation[,] it does not reach so far as to protect plaintiffs from undiscriminating intimidation by bullish and abusive supervisors." *Curtis v. Airborne Freight Corp.*, 87 F. Supp. 2d 234, 250 (S.D.N.Y.2000). Plaintiffs will have the task then of trying to convince a jury that race was the motivating factor behind Callaghan's and Schaut's conduct.  Even assuming a jury credits the evidence in the record in plaintiffs' favor, such a finding, although reasonable, certainly is not the only possible outcome after trial. A verdict in favor of Verizon likewise is plausible and would be based on a reasonable view of the evidence too.

admitted, however, that she never reported to Adecco that Schaut allegedly used the term "nigger." She reported that she complained generally to Adecco on two or three occasions of rude behavior. During one conversation, an Adecco employee told McDonald that she could transfer to another assignment if she was unhappy. Plaintiff refused because the Verizon facility was convenient to her home.

An employer may escape liability if it shows that (a) the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer. *Burlington Indus.*, 524 U.S. at 765. Here, Adecco has shown that it had a discrimination policy in place, that it gave plaintiff a copy of that policy, that plaintiff failed to take the steps necessary to complain to her Adecco supervisor about that harassment, and even assuming that she did, she failed to take advantage of whatever corrective measures the employer offered. I find, therefore, that Adecco is entitled to summary judgment.

### C.    Gender-based Hostile Work Environment

In addition, I find that Verizon is entitled to summary judgment on plaintiff Sams's gender-based hostile work environment. Verizon argues that the two incidents Sams alleges in which Callaghan propositioned her are insufficient evidence that Sams was subjected to an objectively hostile work environment that was severe or pervasive. I agree.

At her deposition, Sams acknowledges that the only incidents of sexual harassment occurred on the two dates in November 2001. Specifically, she states that after the second incident where she rejected Callaghan's overtures, there were no further advances made by Callaghan or any other employee or supervisor. Moreover, plaintiff admits that Callaghan never touched her inappropriately

at any time during her employment.  "Isolated, minor acts or occasional episodes do not warrant relief . . . a plaintiff must still prove that the incidents were 'sufficiently continuous and concerted' to be considered pervasive or that a single episode is 'severe enough' to establish a hostile working environment." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir.1999) (citing *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 437 (2d Cir.1999) (internal quotations omitted).  Here, the frequency of the conduct is not sufficiently continuous and concerted.

The conduct is also not severe enough to overcome the element of infrequency.  Sexual assault, for example, is the type of conduct that is severe enough that even one episode may be sufficient to establish a hostile work environment. *See Richardson*, 180 F.3d at 437 ("'even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment'") (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995).  Nothing alleged by Sams, however, is of that nature.

Also, there is no indication that Callaghan's propositions were physically threatening or humiliating.  Although, if true, Callaghan's behavior would be inappropriate, Sams testified that she merely felt extremely uncomfortable - a standard far short of feeling physically threatened or humiliated. Moreover, there is no indication that Callaghan's propositions unreasonably interfered with Sams's work performance.  Unlike cases of regular verbal harassment or physical groping, there is no allegation here that Callaghan's two propositions constituted a distraction significant enough to meet this standard.

The factual allegations, even if believed by a jury, simply do not support a finding of a hostile work environment based on sexual harassment.  The fact that there were only two incidents, occurring within one week of each other, and that such incidents, albeit inappropriate, were brief and

not threatening and do not support Sams's hostile work environment claim. *See Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58-59 (2d Cir.2004) (granting summary judgment where supervisor propositioned employee for sexual relations on two occasions within one month, as such "episodes of harassment, far from being pervasive, were few and occurred over a short span of time" and were therefore insufficient to create a triable issue of fact regarding the hostile work environment claim). Summary judgment should, therefore, be granted to defendant.

In addition, I find that Sams's other claims that she was shunned by co-workers, excluded from meetings, or that her job responsibilities were decreased, do not require a different result. Sams has not produced sufficient evidence that this conduct was based on her gender or her refusal to accept Callaghan's invitation. In short, even if believed by the jury, Sams's allegations regarding certain mistreatment by co-workers does not rise to a level sufficient to state a hostile work environment claim. Sams has failed to raise a question of fact regarding whether the workplace environment was permeated with such discriminatory intimidation, ridicule, and insult based on her sex that a reasonable person would find that the terms and conditions of employment were altered. *See Kotcher v. Rosa and Sullivan Appliance Ctr.*, 957 F.2d 59, 62 (2d Cir.1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief."); *Benette v. Cinemark U.S.A., Inc.*, 295 F.Supp.2d 243 (W.D.N.Y.2003) (alleged vulgar language, if proven, was not sufficiently severe or pervasive to create hostile work environment based on sex); *see also Alfano*, 294 F.3d at 379-81 (collecting cases) (reversing jury verdict for plaintiff on hostile work environment claim where five incidents were insufficient to meet severity or pervasiveness standard); *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 872-75 (5th Cir.1999) (summary judgment granted on hostile work environment claim, where, in a two-year period,

coworker made lewd comments about plaintiff's anatomy, tried to look down her shirt, and touched her numerous times).

Finally, I agree with Verizon that Sams cannot bolster her claims of *gender*-based hostile work environment with claims that Shaut and Callaghan may have created a *race*-based hostile work environment.  "A plaintiff who is alleging one 'type' of hostile work environment discrimination may not generally use evidence of other 'types' of discrimination to support his claim . . . [unless] there is a sufficient nexus between the two types." *Sidari v. Orleans County*, No. 95-CV-7250, 2000 WL 33407343, *3-4 (W.D.N.Y. Oct. 3, 2000).  Here, there is no such nexus between the alleged race discrimination against African-American employees and the sexual harassment claim raised by Sams - a Caucasian female. *See Sidari*, 2000 WL 33407343, at *5 ("The Court finds no such nexus between the allegations of gender discrimination against plaintiff's co-workers and plaintiff's claim of national origin discrimination . . . .").

Plaintiff's reliance on *Cruz* is misplaced.  In *Cruz*, plaintiff, an Hispanic female, alleged that her supervisor created both a gender-based and a race-based hostile work environment.  The Second Circuit held that a jury could find that Cruz's supervisor's racial harassment towards her "exacerbated the effect of his sexually threatening behavior and vice versa." *Cruz*, 202 F.3d at 572.  The Court found, though, that plaintiff had adduced sufficient evidence to support "independent racial and sexual harassment claims," and that the evidence had not been aggregated to support one claim or the other claim. *Id.*  Here, however, Sams is Caucasian and, unlike plaintiff Cruz, she does not allege that Verizon created a race-based hostile work environment as to her.  Rather, she seeks to use evidence of harassment directed at African-Americans (a class of which she is not a member), to bolster her gender-based harassment claims, which she cannot do. *See, e.g., Rivera v. Baccarat,*

*Inc.*, No. 95 Civ. 9478, 1997 WL 777887 (S.D.N.Y. Dec. 15, 1997) ("evidence that other . . . employees may have been victims of gender bias or sexual harassment has no bearing on the plaintiff's claims of national origin and age discrimination in this case.").


## IV.  Retaliation

Lastly, I find that Davis's and Sams's claims of retaliation must fail.  Plaintiff McDonald, however, has raised a question of fact regarding retaliation.

Claims of retaliation are analyzed under the familiar *McDonnell Douglas* burden-shifting rules.  *Richardson*, 180 F.3d at 443.  To make out a *prima facie* claim for retaliation, a plaintiff must show: (1) that she participated in a protected activity; (2) that the defendant knew of the protected activity; (3) that she suffered an adverse employment action; and (4) that a causal connection exists between plaintiff's protected activity and the adverse employment action.  *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 113 (2d Cir.2000).

Once plaintiff makes such a showing, the burden shifts back to the employer to show that there was a legitimate, non-retaliatory reason for its actions.  If the employer meets its burden, the burden shifts back to the plaintiff to show that "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation."  *Richardson*, 180 F.3d at 443.

### A.      Davis

The parties do not dispute that Davis engaged in protected activity or that Verizon knew of that activity.  Davis made internal complaints of discrimination and filed an EEOC charge in April

or May of 2002.  The parties disagree on whether Davis suffered any adverse employment action or whether a causal connection exists between that conduct and her protected activity.

First, Davis asserts that her March 2003 layoff was in retaliation for her EEOC charge.  I find that no reasonable juror could draw that conclusion based on this record.  The temporal gap between Davis's EEOC charge and her layoff (almost one year), is too large to establish a "causal connection" between them. To establish the causal connection, plaintiff must "be able to provide either direct evidence of retaliatory animus or make an indirect showing that a protected activity was followed closely by retaliatory treatment." *Lewis v. Snow*, No. 01 Civ. 7785, 2003 WL 22077457, at *8 (S.D.N.Y. Sept. 8, 2003).  She cannot do that here. *See Fields v. New York State Office of Mental Retardation & Developmental Disabilities*, 88 F.Supp.2d 4, 8 (N.D.N.Y.2000) (nine months between protected activity and termination "does not create or permit an inference of discriminatory animus"); *Duviella v. Counseling Serv. of Eastern Dist. of New York*, No. 00-CV-2424, 2001 WL 1776158, *19 (E.D.N.Y.Nov.20, 2001), *aff'd*, 52 Fed.Appx. 152 (2d Cir.2002) (termination eight months after complaining about discrimination was insufficient to establish temporal proximity between protected activity and adverse employment action).

In any event, I find that Davis has failed to raise an issue of fact regarding whether Verizon's proffered business reason (a business reorganization) was merely a pretext to cover improper retaliation. It is undisputed that the reorganization that Verizon undertook had a significant impact and resulted in 120 layoffs in Rochester. Thus, no reasonable view of the evidence could support a finding that such a large reorganization was merely a pretext to terminate a single employee, Davis. *See Benette*, 295 F.Supp.2d at 253 (employee's termination was not causally connected to her

discrimination complaint, and thus did not constitute retaliation, where she was one of over 100 employees laid off).

Davis also alleges that Verizon instituted a mandatory arbitration procedure for new employees after she and others had filed charges with the EEOC. The record shows that at some point in the late summer of 2002, Verizon required mandatory arbitration of disputes for those hired from the pool of contract employees. It is undisputed, though, that this policy never applied to permanent employees of Verizon (which would have included Davis), and that it applied only to the group of Adecco contract employees hired from the temporary pool in August 2002. Further, at no time did the arbitration clause affect Davis, as she was not terminated until March 2003. Therefore, she cannot show that the implementation of this policy constituted an adverse employment action for her.

Finally, Davis's other claims of retaliatory behavior do not support a retaliation claim because they do not amount to "adverse employment actions" within the meaning of Title VII. As discussed above, an adverse employment action is a "materially adverse change" in the terms and conditions of employment. *Richardson*, 180 F.3d at 446. A "materially adverse" change in working conditions "is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir.2005) (citations omitted). Such adverse changes include termination, demotion, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities. *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000).

Menacing looks, name calling, or being shunned by co-workers does not constitute an adverse employment action. *See Harrington v. County of Fulton*, 153 F.Supp.2d 164, 170

- 31 -

(N.D.N.Y.2001). Nor does exclusion from meetings. *See Quarless v. Bronx-Lebanon Hospital Center*, 228 F.Supp.2d 377, 385-86 (S.D.N.Y.2002)(general harassment, shunning and exclusion from meetings were not "adverse employment action[s]"); *Marshall v. State of N.Y. Div. of State Police*, 18 F.Supp.2d 194, 203 (N.D.N.Y.1998)("fact that plaintiff was displeased when not asked to attend meetings" was not an adverse action).  Moreover, increased scrutiny or general monitoring does not rise to the level of an adverse employment action. *Scafidi v. Baldwin Union Free Sch. Dist.*, 295 F.Supp.2d 235, 239 (E.D.N.Y.2003)("[w]hile 'close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions'"); *Demars v. O'Flynn*, 287 F.Supp.2d 230, 245-46 (W.D.N.Y.2003) (heightened monitoring was not adverse employment action); *Honey v. County of Rockland*, 200 F.Supp.2d 311, 320 (S.D.N.Y.2002)("[C]ourts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions"). Therefore, Davis's other alleged claims of retaliation fail because she cannot show that she suffered an adverse employment action.

### B.    McDonald

I find, however, that plaintiff McDonald has raised a sufficient question of fact regarding whether Verizon's decision not to hire her in August 2002 was in retaliation for her charge of discrimination. McDonald filed a charge of discrimination with the EEOC on May 10, 2002.  Three months later, Verizon elected not to hire her for a permanent position, although it hired approximately twenty to thirty other Adecco employees into permanent positions.

Verizon has not offered any legitimate business reason why McDonald was not hired. Instead, Verizon claims that McDonald cannot prove her discrimination claim based on the failure

- 32 -

to hire her because over one-half of the Adecco employees who were hired were African-American. That evidence may demonstrate that Verizon did not fail to hire McDonald based on her race, but it says nothing as to whether Verizon was motivated by McDonald's EEOC filing.  In addition, McDonald potentially would have been affected by the arbitration procedure that Verizon required for those hired in August 2002.  Therefore, a reasonable jury could conclude that McDonald would have been required to sign the arbitration agreement as a condition of being hired, thereby waiving her rights to pursue the claims asserted here.[9]

McDonald's other claims of retaliation, however, fail for the same reasons that Davis's retaliation claims fail.  Claims that she was excluded from team meetings and subjected to additional call monitoring or increased "scrutiny" by her supervisors in retaliation for filing the EEOC charges cannot withstand summary judgment.  That conduct does not rise to the level of a sufficiently adverse employment action to support a retaliation claim.

### C.    Sams

Finally, plaintiff Sams's retaliation claims must fail.[10]  Sams claims that she was demoted to rep in retaliation for filing her EEOC charge.  The record shows that Sams took disability leave

---

[9]  Notably, the EEOC determination on Sams's discrimination charge found that there was reasonable cause to believe that Verizon had amended its hiring policy by instituting mandatory arbitration as a condition of employment for new hires "as a retaliatory strike after the filing of charges."  Whether the EEOC made a similar finding in the determination in the McDonald case is not clear, as that determination is not contained in the record.

[10]  Sams's retaliation claims based on her termination have been dismissed because Sams failed to raise an issue of fact regarding the legitimate business reasons why Sams was ultimately terminated – that is her alleged falsification of an application for disability benefits.

in July 2002 and was subsequently demoted on July 8, 2002.[11]   This demotion occurred approximately three months after plaintiff filed her EEOC charge.

There is no dispute that demotion is an adverse employment action. Further, because only a few months passed between the time of the EEOC charge and plaintiff's demotion, an inference arises that there is a causal connection between the protected activity and the adverse employment action. Sams, therefore, has established a *prima facie* case of retaliation with respect to the demotion.

I find, however, that she has failed to raise an issue of fact regarding whether Verizon's legitimate business reason for demoting her was merely a pretext for retaliation. It is undisputed that Verizon demoted four of the eight COOSs in the summer of 2002 as part of the reorganization. Sams was one of the four who were demoted.  Two of the COOS, Schaut and Chasey, had not filed EEOC charges or informal complaints of discrimination.  In addition, two of the COOS who were *not* demoted, including Davis and Sheela Eason, had also filed EEOC charges.

I find, therefore, that no reasonable jury could conclude that Sams was singled out for demotion in retaliation for filing an EEOC complaint.  The only evidence she has offered to support that claim is her own speculation, which is insufficient to raise a jury issue concerning the legitimacy of Verizon's proffered reason.  *See Wado v. Xerox Corp.*, 991 F. Supp. 174, 197 (W.D.N.Y.1998), *aff'd sub nom. Smith v. Xerox Corp.*, 196 F.3d 358 (2d Cir.1999); *see also Meiri*, 759 F.2d at 998 ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").  Therefore, Sams's retaliation claims must fail.

---

[11]  Plaintiff does not raise any argument that the demotion stemmed from her disability leave; her claim is that the demotion occurred because of the EEOC charge.

**CONCLUSION**

In *Davis v. Verizon*, 02-CV-6628, the remainder of defendant Verizon's motion for summary judgment (Dkt. #28) is granted in part and denied in part. Davis's third and fourth claims based on retaliation are hereby dismissed with prejudice. Davis's first and second claims alleging race-based hostile work environment must be resolved by a jury.

In *McDonald v. Adecco and Verizon*, 02-CV-6637, the remainder of defendant Adecco's motion for summary judgment (Dkt. #30) is granted and all remaining claims against Adecco are dismissed with prejudice.

The remainder of defendant Verizon's motion for summary judgment (Dkt. #30) is granted in part and denied in part. McDonald's first and second claims alleging race-based hostile work environment and her third and fourth claims alleging retaliatory discharge must be resolved by a jury. The remainder of McDonald's third and fourth claims alleging other forms of retaliation, however, are dismissed with prejudice.

In *Sams v. Verizon*, 02-CV-6635, the remainder of defendant Verizon's motion for summary judgment is granted (Dkt. #25) and all remaining claims against Verizon are dismissed with prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       October 5, 2005.

- 35 -